Our next case is 22-4045 Matney v. Barrick Gold. Mr. John Doe. Thank you, Your Honor. May it please the Court, I am Mark John Doe and I represent the plaintiffs in this matter. I reserve five, if I may, I reserve five minutes for rebuttal. Your Honors, in this case, we believe the district court's opinion should be overturned for four reasons. The first is the district court's ruling regarding our lowest- Could you put the mic a little closer to you? Oh, sorry. Thank you. The court's ruling regarding our lowest-share class claim is in conflict with every circuit that has addressed the issue and the Supreme Court's decision, Hughes v. Northwestern. We believe this is an issue of first impression for this Court. The second reason is that the district court's ruling regarding our record-keeping claim is in conflict with decisions of several courts, including the Seventh Circuit's recent Hughes v. Northwestern decision, which was a remand from the Supreme Court. The third reason, Your Honors, is that the district court's ruling regarding our investment fund claims is in error because it failed to consider the totality of circumstances alleged in the complaint. Counsel, could you precisely tell us what exactly is the issue of first impression? So, the issue of first impression is whether, when the plaintiff alleges that planned fiduciaries selected a more expensive version of an identical fund, it is a- they have alleged enough to get past the motion to submit stage. Here, we allege that there were share classes which were identical, some more expensive than others, and the planned fiduciaries selected the more expensive ones. The district court said that we were incorrect because there was revenue sharing, which was credited back, but to the funds, which then made them lower cost. However, the problem is the- a defendant argues revenue sharing as a defense. It is improper to allow that defense at the motion to submit stage because there's several reasons why that could be erroneous or improper. If we alleged a complaint, it was improper to have that revenue share. So, are you suggesting that revenue sharing is a- is like a factual question that needs to be developed at a different stage of the case? The factual question is why did you use a revenue share and how it was applied? The issue- revenue share itself is ubiquitous, but- Right, whether it's a prudent model. Exactly, exactly. And, in fact, I think there's a district court case in Trout, from Colorado, and it corresponds perfectly. It's the manner in which it was applied that is the question. How does it create a fact question here? I mean, as I understand the district court's order, when you adjust the revenue sharing part of the master trust agreement and the other documents, it shows that there's really not a material difference in the expenses versus the funds you're advocating, the index funds, passive funds, the CITs. What's the factual question? I mean, the documents do require, I guess, the revenue sharing percentage. Okay, so- What's the fact question? So, there's actually separate issues there. There were alleging with a lower share class claim- I'm sorry? The lower share class claim deals with specific funds, JP Morgan funds, and the fact question there is not- isn't entwined with our record-keeping claim, because we say they used- the revenue share they used was used to pay for excessive record-keeping. So, by the court acknowledging as a fact that it was a lower share expense, it was a lower share fund, they're essentially blessing the defendant's argument and their defense that what they did was proper. Are you talking about the prudence claim or the record-keeping? Sorry, the prudence claim, but for the lower share class claim and the record-keeping claim are intertwined, because the revenue share from the higher share classes were used to pay for record-keeping. So, I think you have to consider the two and the totality of circumstances there. Well, let me restate my question, just so I understand your response. Your opposition's argument is that if you adjust the- or use the revenue sharing percentage, and you compare that with the funds you're advocating, that eliminates the cost disparity. And once you eliminate the cost disparity, then your claim of prudence evaporates, because the funds you advocate are just as expensive or not expensive as the funds that were selected by the trustees. I disagree to the extent that it doesn't necessarily make it a lower cost, because if the revenue sharing was too much or was used improperly, it should never have been applied to the higher- it should never have been in place, because it's being used to pay for excessive record-keeping costs. There is a fact issue as to whether it was indeed appropriate to apply the revenue share to the funds, which made it less expensive than the- Why do we have an apples-to-apples comparison here, then, on your share class funds? I think it's apples-to-apples, because on the face of it, the share class they chose had expense ratios that were higher, which were more expensive than identical share classes. It only became lower because you brought in the revenue share, which was the additional consideration. But if you really want to look at apples-to-apples, if you looked at the prospectus for the R6 and R5 funds, it will tell you what the prices were, and clearly, theirs is more expensive. It only became less expensive because they took another step with the revenue share. And that's all we're saying. And I think what all the courts say is, look, they may be correct in the end, that it was appropriate to use a revenue share to reduce the prices. But I think what the courts allow the plaintiffs to go forward with is that, you know, if you start from the premise that you have two items that are identical, and one's more expensive than the other, and you choose the more expensive one, there needs to be some reasoning behind it. But we can't get into this reasoning at the pleading stage. And that's all we're saying. You mentioned at the top of your argument that there's a number of circuits that have agreed with you, essentially. I think the only case you cite in your brief that's specific to this issue about revenue sharing and whether it's defense and whether it's a fact question is that Salesforce, that unpublished Ninth Circuit case. Did any of the other circuits, did anyone address this particular issue that we're talking about? Yeah. No, so Salesforce is directly on point because it dealt with the same J.P. Morgan funds. It was the same argument by defendants. But the other courts, such as Hughes v. Northwestern, Davis v. Washington, Sweden v. University of Pennsylvania, Conn v. Trudeau-Jones, they all said, look, we're not even going to get into it. You've pled that identical share classes, one's more expensive than the other. They figure it out in discovery. But I'm pointing you to Salesforce because it's the exact same argument. And no circuit has said, you know, that has really addressed this, has gone the other way and said defendants are allowed to essentially argue for why they use the, on face value, the more expensive share class. So, yeah, I just urge the courts to follow the other circuit courts with regard to the lowest share class claim. With regard to the related recordkeeping claim, our argument here is that, again, the district court did not look at the totality of circumstances because in the complaint, we have led several instances which made it plausible that the company was overpaying for recordkeeping. Among others, we cited the recordkeeping language from Fidelity, which said that there was no way they would perform services that are ministerial in nature. That was paragraph 111 of our complaint. We also allege that nearly all recordkeepers offered the same range of services. That was paragraph 110 of our complaint. We allege that Fidelity was a recordkeeper for 18 years. Have you alleged, though, that the fees, the recordkeeping fees, were excessive compared to the services that were received? Yeah, and this is how we did it. We said that all recordkeepers provide generally the same services. Here, Fidelity has said that in their own service agreement, they're providing ministerial services in nature. So that gives the impression that there's nothing out of the ordinary for these services. So then we look to see, okay, what are the other service providers providing? And we show in our complaint that they were paying multiple times what other plans were paying for recordkeeping. Well, you used that 401k average book. Yeah, we used the 401k averages book. But the Eighth Circuit didn't like that too much. I mean, it seems to analyze smaller plans. Again, it's not an apples-to-apples comparison. It's not an apples-to-apples. I think the confusion, maybe it was our fault for not explaining it correctly, but I don't think it's deniable that the recordkeeping fees go down the more participants you have. So if you cite to a smaller plan that paid less fees, then logically a bigger plan shouldn't pay more than the smaller plan. Did you allege that in your complaint? Well, yes, in the same paragraph where we talk about the 401k averages book. I just want to reserve more time. Related to that, one of the issues here is we had also asked for a motion for reconsideration to file an amended complaint. The problem with that is you didn't file a notice of appeal after the motion for reconsideration was denied. You've got a jurisdictional issue there, don't you? Right, but you filed your notice of appeal before that, and our case law indicates that once the district court... You didn't amend your notice of appeal to include the denial of the Rule 59e motion. Okay, yeah, so we did not amend it. I think in our appeal we mentioned it. That's how you get to your argument that you want to file an amended complaint, though that's the only way you get there, isn't it? Our second amended complaint. I only mention that because I think our complaint does stand on its own with the plausibility factor. Besides the 401k averages book, we mentioned other things, including their failure to use a request for proposal. The facts we allege are very similar to what the Seventh Circuit said was sufficient in the Hughes v. Northwestern decision that just came down a couple of months ago, and we've submitted that. It's almost allegation per allegation, and I think the overall takeaway from the cases we've cited is that it is improper for a district court at the pleading stage to draw reasonable inferences in defendant's favor, and we believe here the district court in almost every instance drew every reasonable inference in defendant's favor rather than drawing it in plaintiff's favor. And by doing so, and also it parsed all our different claims and analyzed it one by one instead of looking at the totality of circumstances. And had the court done that, I believe the decision would have been different and it would have been similar to the other circuit court decisions that have ruled in favor of plaintiff. Not to mention the other myriad of district court cases we cite where the plaintiffs have prevailed, where they have pled almost exactly the same type of claims we pled here. I only have 52 seconds, so I'll just reserve the rest for rebuttal. Thank you, counsel. Good morning, Your Honor. May it please the court, Sanford Weisbruch for Barrett Gold. I'd like to start with the share class point. So, first of all, I'm not sure which circuit cases my friend on the other side is reading, but the 6th, the 7th, and the 8th circuits have all been very cautious and strict at the pleading stage. Now, share class is kind of a unique situation, I will admit, because it is a situation where those courts have acknowledged that it's apples to apples between two share classes. Where this case is indeed a case of first impression, at least in the ERISA context, is in terms of is it a more expensive class or not. And my friend on the other side says, well, you're bringing in a defense. Not true. What we're doing is we're relying on a document that is relied on in the complaint. And under this Court's non-ERISA case law, and I'd refer the Court to cases including Jacobson and Spring Creek, which are cited in our briefs, the defendant on a motion to dismiss is allowed to bring into play a document that was centrally relied on in the complaint. That's all we're doing. And to give you an example, Supplemental Appendix 128, 314 to 317, is where this Court can find this .15% discount off of the expense ratio in the R5 class. Why isn't there still a fact question embedded in there along the lines that Salesforce and Kong discerned? Sure. So both Salesforce and Hughes, the recent Hughes 7 cert decision, did involve share class claims that I will recognize survived the motion to dismiss. What was missing in those cases, though, is there was no documentary evidence of exactly how much the discount was for the share class. That's what's unique about our case. And we're not asking the Court to draw any inferences. We're asking the Court to just look at the plain language of the piece of paper that governs how expensive the share class is. And it says reduce by .15%. So it's not an inference. It's looking at the plain language of the document and noting that it reduces it. And this Court is not required to credit the complaint's allegations over a document that's referred to in the complaint. Again, that's the Spring Creek case from this Court in the non-ERISA context. So how is a plaintiff supposed to challenge the improvements of revenue sharing? So let me turn to revenue sharing. So my friend on the other side says, all right, even if there's a concrete amount, it's going towards revenue sharing, and we have a revenue sharing complaint. And I'm prepared to address the recordkeeping issue as well. But I do think on the share class point, just before I move off that, we do have this concrete discount, which can be considered by the Court, which shows that, in fact, the class that was offered by the plan is less. And that money, that discount money, because money is fungible, it counts. It makes it a less expensive class. Now, I grant that my friend on the other side is complaining about recordkeeping fees, says they're too high. This Court should certainly consider that claim. I'm not suggesting otherwise. But what I think he has to establish is that that claim independently passes the plausibility threshold. He can't get there just because it comes from a revenue credit that's concrete in the documents. So let me turn to the recordkeeping point. Basically, the idea is he says, all right, here's what the recordkeeping fee is for Barrickgold's plan. I'm going to compare that to principally the 401k averages book, which there was a colleague, Judge Moritz, about that. And our response, referring to case law, recent case law, including the Matusak case from the Eighth Circuit, which dealt with that same argument, but also the Sixth Circuit's decision in Smith v. Common Spirit Health, what a plaintiff has to do to make out a recordkeeping fee prudence claim is to show that the services in the two comparative plans, both the plan that's being complained about and the comparator plan, were similar services, and yet one was being charged more than the other for that. And this complaint here, all it does is slap a label on that and says that they're similar services. It doesn't go through what the underlying services were. And I heard a reference to fidelity in a document saying they're ministerial, but this Court could refer to the list of the services. They're not just ministerial. For example, if we look at Supplemental Appendix 51 and specifically 54, these services include also education. Keep in mind, what is the purpose of these plans? It's to help employees of Barrett Gold prepare for retirement, figure out which investments from this menu they should choose. And there's an educational function, and that costs money, but it serves an important purpose. So this is not just processing an account statement once a month. It's also education. Is the document you're referring to, is that referenced in the complaint? It is, yes. I believe that that is an amendment to the Master Trust Plan, and both the Master Trust and the amendments are referred to in the complaint. And several other circuits, by the way, have considered documents like that at the motion-to-dismiss stage. This Court would not be breaking new ground in that respect. Now, there's a failure, then, to compare the services that are being rendered. I also heard an argument that said, well, we looked at the smaller plans in the 401K Average book, and it's logical that smaller plans are going to be more expensive for a smaller plan than for a larger plan. So if Barrett Gold is costing more than the smaller plans, then it must be imprudent. But, again, the circuits that have addressed that specific argument, Smith v. Common Spirit Health, the Sixth Circuit decision by Judge Sutton, as well as the Eighth Circuit and Matusek, have said, no, you can't draw that inference in favor of the plans at the motion-to-dismiss stage. You have to look at what services are offered. Sometimes larger plans offer better services. Sometimes they offer education, for example, as I just mentioned. So you can't just compare them to an average of smaller plans. That's apples and oranges, or one of the amicus called it apples to fruit salad. You need to compare the services, but beyond that, there's another very important point about record keeping. If we look at the actual 401K Average book, we see, and this is a, bear with me for one moment, a page, Supplemental Appendix 792 is the actual page of the 401K Average book. Again, clearly relied on a complaint, clearly eligible for consideration by this court. And it says there's a $5 fee for administration, and that's what my friend on the other side points to. And he says, well, Barrett Gold's plan record keeping fees were in the order of $100. And look at the 401K Average's book. It says $5. Bingo. We've got imprudence. But the 401K Average's book does not just say $5. It also has an amount of $160, which it puts under the category of revenue sharing. So you take the $160 and you add it to the $5, and you actually have a number that's significantly higher than the Barrett Gold record keeping fee. So not only do we have an apples to oranges comparison, but as with the share class, we have a situation where they're actually looking at the wrong numbers. And that was the thrust of this district court decision here by Judge Campbell. They used the wrong numbers. I can look at these documents that they refer to in the complaint, and I can see that the numbers are actually wrong. They go in the other direction. They show that Barrett Gold is prudent, not that it's imprudent. So just to sum up on the record keeping point, we've got both the apples to oranges point, and we also have the numbers being wrong. Can you go back on the shares class argument and talk to me about why this case is different than Hughes? Sure. Hughes, pretty much the same arguments being made, and I think that's the Seventh Circuit. They weren't impressed with the idea that revenue sharing could explain the difference. In fact, they said that's just one plausible explanation, and there could be plenty of other explanations. We don't know that, and so that's why it's a fact question. So why is that persuasive? The critical difference between this case and Hughes as well as between this case and the unpublished Ninth Circuit decision in Davis v. Salesforce is that there was a sort of speculative general argument about, hey, this share class might be higher, but we're going to use the higher amount for revenue sharing. There was no documentary proof in either of those cases. But that didn't seem to matter to that court's decision. They basically assumed that there was revenue sharing and that it was a credit. But they said that doesn't explain everything. There's still other possible plausible inferences to be made. That's the way I read it. They just assumed it. It wasn't about whether there was documentation, which we happen to have here, or there wasn't. It's just that it's a fact question is essentially what they were saying. So I do think it was important that there was no concrete number for the discount. And if I could just refer the court to something specific on this point. So one of the unpublished Ninth Circuit cases along the lines of Davis v. Salesforce is this Cong v. Trader Joe's case. And the quote from that decision was that defendants identified only a revenue sharing agreement that could occur in theory, not what occurred in fact. And that is precisely the point that I'm trying to make. What we showed through a document is what occurred in fact. We showed that there was a .15% discount given to the R5 share class, which once considered made it cheaper than the R6 share class. Do we know exactly how it was applied though? Could it still have been applied to record keeping? Yes, and there's a slight nuance. So that's how the record keeping might come in or other services? There's a slight nuance based on the time period. I mean the manner that it's applied is a fact question too. So from 2017 and afterward, Barrett Gold's approach to record keeping was to charge a fixed amount per participant. And so there was no account storage fee of revenue sharing for the entire plan anymore. The participants were charged per person a specific amount. In that era, this .15% is a direct discount on what the participant is paying for that investment. So that part is actually very easy to understand. In the pre-2017 time period, Barrett Gold's approach was indeed to collect amounts that were used in revenue sharing. They did not charge a particular dollar amount per participant. And in that era, it was indeed used towards revenue sharing. But again, the point that I'm trying to make is that unlike in those other cases, you didn't know the specific amount that was going to be contributed, and here you do. And because money is fungible, and because you have to pay for these record keeping fees somehow, there's no reason why this Court shouldn't take into account that the R-5 class was actually cheaper. And certainly, we should be put to our burden, well, I should say the plaintiff should be put to its burden of showing that its claim is plausible as to the record keeping fees. I'm not trying to say otherwise, but we believe he fails under the Matusak case, under the Albert case from the Seventh Circuit, and under the Smith case from the Sixth Circuit. You know, finally, I think it's important to sort of take a step back here. And I mentioned that the Sixth and the Seventh and the Eighth Circuits are really the courts that have the most case law in this area. The Ninth Circuit has a few unpublished decisions. And what they've done is I think they've taken a very careful look, even after the U.S. Supreme Court's decision in Hughes at these claims. And I think it's important to remember why that should be the case. If courts are going to allow a lot of these cases to go forward that are sort of cookie-cutter complaints filed across the country against any manner of employers, and, you know, in fact, has attracted the attention in this very case of the Chamber of Commerce, the Investment Company Institute, what it's going to do is subject employers to expenses. Even if going through discovery, that's expensive. And it's going to cause employers to sort of cut back on the options that they can offer their employees. They're not going to offer these actively managed funds anymore. They're going to switch to just index funds. It seems to be your own opinion here. Is this in the record somewhere? It's a concern that's been raised actually by the courts. So the Smith v. Common Spirit Health is an example where they've said, look, if this kind of claims go forward, there's going to be less choice. The amicus briefs also back me up on this. It's speculative is what I'm saying. It's speculative. I think it is supported by the court decisions. It's really not just me saying it. But that's the reason. And in the extreme, employers might not offer plans at all. They're not obligated by law to offer these. And this is potentially substantial liability even to go to discovery. And I'm not suggesting that no claim should ever survive. What I am suggesting is that this court should apply the well-settled rule that documents can be considered at the motion-to-dismiss stage and should follow the other circuits on the record-keeping fee. With that, I'd ask the court to affirm. Thank you. Thank you. Some rebuttal. Thank you, Your Honors. I just have a couple of brief points to make. On the record-keeping claim, I do want to emphasize that it wasn't just our citation to the 401k averages, but they were just looking at the plan itself and the behavior. There's certain things, certain actions that were taken that can, when viewed in plaintiff's, the best light for plaintiffs, show a plausible claim. For instance, there were up until before 2017, they were realized they were paying something like $100 per participant. In 2017, when they go to a per-participant fee, it's suddenly $68 per participant. The question becomes, why the big drop? We don't know. There's nothing in the record that says they negotiated that big drop, but maybe it's because they went to a more prudent version of the collective record-keeping. These are all factors that need to be developed and looked at like most favorable to plaintiffs, such as there was a breach of fiduciary duty. All right, counsel, thank you very much. Your time has expired. You're both excused and the case will be submitted.